# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1492-19

G.D.,

    Plaintiff-Respondent,

v.

U.D.,

    Defendant-Appellant.

_____

Submitted December 9, 2020 – Decided March 22, 2021

Before Judges Alvarez and Sumners.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-1715-18.

Ryan E. Gilbert, attorney for appellant.

Spencer & Associates, LLC, attorneys for respondent (Remi L. Spencer, on the brief).

PER CURIAM

Defendant U.D.[1] appeals the entry of a June 20, 2019 final restraining order (FRO) pursuant to the Prevention of Domestic Violence Act (Act), N.J.S.A. 2C:25-17 to -35.  He also appeals the judge's November 18, 2019 reconsideration decision awarding plaintiff G.D. $31,978 in counsel fees and $4000 in punitive damages.[2]  See N.J.S.A. 2C:25-29(b)(4) (authorizing punitive and compensatory damages for acts of domestic violence).  We affirm.

The trial was conducted over six months on seven days.  Many text messages and emails were introduced by both parties that clearly supported the judge's finding that the parties had a "volatile" relationship.

Plaintiff testified that on April 28, 2018, shortly after she dismissed a temporary restraining order (TRO) she had previously obtained protecting her from defendant, he appeared at her home.  Plaintiff, who had been asleep, came downstairs in her pajamas, a sweater, and "pajama bootie things . . . ."  Defendant had earlier texted that he was on the way—but since plaintiff had gone to bed, she did not see the message.  Her twenty-three-year-old daughter answered the door and awakened her.  Plaintiff did not want her sixteen-year-

---

[1] We use initials to protect the parties' privacy.  R. 1:38-3(d)(9).

[2] The judge awarded plaintiff $614.93 in compensatory damages, which are not appealed.

old son, who was also home, to see her talking to defendant, so she agreed to speak to defendant in his car, and she asked him to park around the corner. Once plaintiff sat in the car, defendant drove off, refusing to let her out. He alternated between verbal abuse and extreme affection. He kept the car doors locked and took her cell phone—as she said, "that's one of the first things he always does, is he takes my phone away." When defendant finally arrived at his townhouse, plaintiff got out and the two struggled for her cell phone. Plaintiff eventually relinquished it, moving towards the house in an effort to gain entry and escape through the front door. Defendant grabbed her left leg and pulled it up while twisting to the side. As he did so, he told her that she would die that night. Plaintiff fell during the brief physical confrontation. When defendant turned back to his car, which he had left still running parked in the garage, plaintiff fled to a neighbor's home. The neighbor immediately let her in, and called police and an ambulance. The cell phone was later found on a garage window sill. Plaintiff was taken to a hospital for treatment; defendant was located at his estranged wife's home sometime later, having left the scene.

Plaintiff described at least two prior incidents. In one, while dining with her daughter and her daughter's friends, defendant deliberately poured a beer over her head. On March 24, 2018, while the two were staying overnight at a

3

motel, she and defendant began to argue. While they were fighting, defendant began to cry, strike plaintiff, and yell, "why do you do this to me, why do you make me do these things to you? Look what you do to me. Why do you do this?" Plaintiff testified defendant strangled her during this altercation, and she escaped, running barefoot into the motel lobby looking for help while defendant followed, throwing things at her, including the contents of her purse. Although the criminal charges she earlier filed were still pending when defendant injured her leg, she had by then dismissed the TRO she had also obtained.

Defendant called three police officers as witnesses, all of whom essentially corroborated plaintiff's testimony. For example, a Union City officer testified that on September 14, 2017, he was called to plaintiff's home. Dispatch informed him that plaintiff's son called 911 to report that he thought he heard the parties pushing and shoving and was afraid of what might happen to his mother. The officer who arrived at the scene on the night of the April 2018 incident at issue testified that the neighbor who called police heard and saw portions of the incident.

Plaintiff's treating physician and orthopedic surgeon also testified. Plaintiff's knee injuries required surgery after a course of physical therapy and reduction in swelling from the trauma inflicted on the joint. Plaintiff's doctor

A-1492-19

almost exclusively performed knee surgeries, hundreds a year. When plaintiff met with him and his office partner, she described the way she incurred the injury in the same terms as she had described to police, and to which she testified at trial.

The surgeon stated that plaintiff told him defendant grabbed her leg and twisted it violently in a figure-four position when she heard the sound of a crack. He compared the injury to those resulting from wrestling or "kids horsing around and one falls on the other . . . ." The surgeon also compared it to a PCL tear that he had seen when a motorcycle fell on a rider stopped at a light. The surgeon surgically repaired plaintiff's torn PCL. The torn LCL and other muscular injuries did not require reconstructive surgery.

The judge sustained defense counsel's objection to the surgeon recounting plaintiff's statement describing how the injury occurred because he had not included causation in his report. By that juncture, however, the doctor had said, without eliciting objection, that the injuries were consistent with plaintiff's description of defendant's assault. On cross-examination, the surgeon repeated that the physical aspects of the injuries were consistent with plaintiff's explanation of how her injuries occurred.

A-1492-19

When asked about defendant's expert's disagreement with his opinion, plaintiff's treating surgeon said that the opinion actually coincided with his own in that the injury was the product of a "lift and a twist and a bend . . . ." He expressed surprise that the expert disputed the manner in which the injury was inflicted, because he treated "knee ligament injuries quite often and [he knew] that they can be injured in a variety of mechanisms and the one described is very consistent with the findings." The surgeon explained, while placing his leg in a figure-four position, that if a person were to fall on him while he held his leg at that angle, "standing or lying on the ground like these kids who wrestle and hurt themselves, the injury pattern would be similar." He further agreed the description plaintiff gave in his office of the way the injury was inflicted was consistent with her testimony. In fact, after being read plaintiff's testimony, the doctor said:

> This is a little more in depth and in detail[,] but this [is] how exactly I pictured it, in a few seconds, these ligaments tear in a matter of nanoseconds. So what happens is a ligament is actually quite elastic if given the opportunity but if it's provid[ed] with a large force that is quick, then it doesn't have the opportunity to become elastic and it's like a stick and it snaps like a twig. So a few seconds is all it takes.

Defendant's expert, a board-certified orthopedic surgeon, did not have a practice specializing in sports-type knee injuries. He disagreed that the injury

could have been caused by defendant pulling plaintiff's left leg with one hand while she stood. He believed she must have fallen or "some other mechanism must have occurred . . . ."

The judge found plaintiff to be a credible witness. He placed the final April 2018 incident in the context of defendant's "escalating" violence. The judge further observed that the "attention drawn in this case to the mechanics of . . . plaintiff's injuries . . . misses the mark." There was a "physical interaction" between the parties during which "plaintiff experienced pain and heard a popping sound when the leg was twisted." Thus, she had established "by a preponderance of the evidence . . . that defendant purposefully grabbed and intentionally twisted plaintiff's leg causing her to experience pain." He considered both doctors to be credible, but gave dispositive weight to plaintiff's surgeon's opinion that the incident caused the injury.

The judge further found defendant committed predicate acts of assault and harassment. N.J.S.A. 2C:25-19; N.J.S.A. 2C:12-1; N.J.S.A. 2C:33-4. He did not reach as moot plaintiff's other allegations of kidnapping, criminal restraint, or terroristic threats. Given the nature of defendant's conduct and the parties'

A-1492-19

history, both prongs were met under <u>Silver v. Silver</u>.[3]  In addition to granting the FRO, the judge fined defendant $250.  Without explanation, he denied counsel fees.

On reconsideration, the judge acknowledged he failed to provide findings of fact and conclusions of law regarding plaintiff's request for counsel fees and costs, compensatory damages, and punitive damages.  After reviewing plaintiff's counsel's affidavit, he reduced the amount requested only to those charges generated by the domestic violence proceedings, as opposed to the criminal proceedings.  He granted $31,978 in fees and compensatory damages of $614.93.

In his reconsideration decision, the court observed that "defendant did not deny the acts attributed to him by this [c]ourt."  Given the history of "wrongful and volatile conduct by [d]efendant towards . . . [p]laintiff," in front of plaintiff's children, in public, and in private settings, he concluded the acts displayed "the requisite element of evil mindedness or bad motive[,]" relying on <u>Sielski v. Sielski</u>, 254 N.J. Super. 686, 690 (Ch. Div. 1992).  He found defendant deliberately inflicted serious injury on plaintiff, and left her in that condition as

_____

[3]  387 N.J. Super. 112, 125-27 (App. Div. 2006) (holding that to qualify for an FRO, a plaintiff must first prove by a preponderance of the evidence that a predicate act of domestic violence occurred and then establish that an FRO is necessary to prevent further domestic violence).

A-1492-19

he fled the scene. Taking into consideration the "severe and extensive physical injury" to plaintiff, the court assessed $4000 in punitive damages pursuant to Act.

Now on appeal, defendant raises the following points:

POINT I

THE TRIAL COURT ERRED IN ALLOWING HEARSAY EVIDENCE FROM THE POLICE REPORT ON THE APRIL 27, 2018 INCIDENT.

POINT II

THE TRIAL COURT ERRED IN ALLOWING [G.D.'S] EXPERT MEDICAL WITNESS TO TESTIFY AS TO HIS OPINION CONCERNING CAUSATION ISSUES NOT INCLUDED IN THE PRETRIAL EXPERT REPORT DISCLOSED TO THE DEFENSE.

POINT III

THERE WAS INSUFFICIENT EXPERT MEDICAL TESTIMONY TO EXPLAIN OR CORROBORATE [G.D.'S] STORY, AND SHE FAILED TO CARRY HER BURDEN OF PROOF.

POINT IV

THE TRIAL COURT ERRED IN ITS BENCH ORDER BY MATERIALLY MISCHARACTERIZING DR. NASAR'S EXPERT MEDICAL TESTIMONY AND MAKING AN ADVERSE INFERENCE FROM [U.D.'S] FAILURE TO TESTIFY.

9

POINT V

[G.D.] OFFERED NO NEW EVIDENCE IN HER
MOTION FOR RECONSIDERATION, AND IN
AWARDING ATTORNEY'S FEES AND PUNITIVE
DAMAGES THE TRIAL COURT RELIED UPON
FACTUAL FINDINGS NOT IN THE RECORD,
PARTICULARLY        [G.D.'S]        UNSUPPORTED
ALLEGATIONS OF PRIOR ACTS OF DOMESTIC
VIOLENCE AND THE LACK OF EVIDENCE OF
[U.D.'S] WANTON CONDUCT.

I.

Defendant first asserts the judge erred in admitting hearsay—specifically, the testimony proffered when a Sayreville Police Officer was cross-examined. The somewhat confused record reflects that the judge sustained defense counsel's objection to the officer's repetition of statements the neighbor made to police. When plaintiff's counsel reframed the question in terms of what the officer "learned," the judge overruled the objection. The officer continued that the neighbor "went outside and saw through a window some type of altercation[;]" counsel again objected. That objection was overruled.

We agree that the material was hearsay. See N.J.R.E. 801(c) (hearsay is an out-of-court statement offered to prove the truth of the matter asserted). Hearsay is inadmissible absent an exception. N.J.R.E. 802.

10

Arguably, the neighbor's description of what he saw and heard constitutes an excited utterance. See N.J.R.E. 803(c)(2). It is unclear from the record, however, if it can be characterized in that fashion, but, in any event, its admission was at worst harmless error. See R. 2:10-2. The comments did nothing more than corroborate what plaintiff had already described, and upon which she was extensively cross-examined. Plaintiff was uninjured when she arrived. She suffered from a significant injury when she left. The officer's limited responses did not lead to a result that the trial court would not have otherwise reached. See State v. Prall, 231 N.J. 567, 581 (2018).

II.

For purposes of our discussion, we combine defendant's point two through a portion of point four into one section. As the judge accurately observed, the focus on "the mechanics of the plaintiff's injuries . . . misses the mark."

Trial courts have broad discretion in evidentiary matters. Brenman v. Demello, 191 N.J. 18, 31 (2007); State v. Sands, 76 N.J. 127, 140 (1978). A decision should "stand unless so wide of the mark that a manifest denial of justice resulted." Ratner v. General Motors Corp., 241 N.J. Super. 197, 202 (App. Div. 1990). Family courts are also afforded broad discretion because they "possess special expertise in the field of domestic relations." Cesare v. Cesare,

11

154 N.J. 394, 412 (1998). Credibility determinations should stand unless "'clearly mistaken' or 'wide of the mark'" as well. N.J. Div. of Youth and Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008).

The same abuse of discretion standard governs the admission or exclusion of expert testimony. In re Accutane Litigation, 234 N.J. 340, 391-92 (2018). It follows that discretion includes the scope of direct and cross-examination. See Townsend v. Pierre, 221 N.J. 36, 52-53 (2015) (holding the trial court has the ability to limit testimony on direct); Prioleau v. Kentucky Fried Chicken, Inc., 434 N.J. Super. 558, 587 (App. Div. 2014) (holding trial courts have discretion to limit expert testimony on cross-examination). A judge is similarly vested with the discretion to assess the weight of and evaluate those opinions. N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 93 (App. Div. 2013). The judge may accept all, none, or just a portion of an expert's opinion. E & H Stahl v. PSEG Fossil, LLC, 455 N.J. Super. 12, 29-30 (App. Div. 2018).

Additionally, "a treating doctor testifying as a fact witness is permitted to testify about the cause of the patient's . . . injury, because causation is an essential part of diagnosis and treatment." Parker v. Poole, 440 N.J. Super. 7, 17-18 (App. Div. 2015) (citing Stigliano by Stigliano v. Connaught Lab., 140

12

N.J. 305, 314 (1995)).  Indeed, a treating physician's testimony cannot be artificially categorized as fact or opinion.  Ibid.  It is both.

Strictly speaking, therefore, plaintiff's surgeon was not testifying in a manner that required him to phrase his conclusions, contrary to defendant's position, to a reasonable medical probability.  The surgeon relied on plaintiff's description of the events in his diagnosis, and found the injuries revealed during the operation corroborated her explanation.  He too was found to be a credible witness, and the judge's acceptance of his testimony to explain causation was a reasonable exercise of discretion.

Plaintiff's credibility was not undermined by the minor discrepancies elicited during cross-examination.  Defendant's expert's testimony in that vein corroborated plaintiff's treating physician's testimony.  Events happened quickly, plaintiff fell during the altercation, and she could not be expected to precisely pinpoint the moment and infliction of force which caused the PCL and LCL injuries.  Thus, the judge's admission and weighing of the experts' testimony were not an abuse of discretion.  When joined with her testimony, the medical proofs established a violation of the Act which warranted issuance of the FRO by a preponderance of the credible evidence.

## III.

The judge did not say that defendant did not testify at trial. For him to have done so, or relied upon defendant's silence in reaching his determination, would have been improper. See H.E.S. v. J.C.S., 175 N.J. 309, 331 (2003) (a court may not make an unfavorable inference due to a defendant's silence in a domestic violence final hearing). He specifically said he drew no inference from defendant's silence. In his reconsideration written decision, the judge did mention that defendant "did not deny the acts attributed to him by this [c]ourt." But that one sentence does not mean the judge violated established precedent.

Nor does it nullify the judge's detailed discussion of the proofs and the law in the reconsideration decision as well as his earlier ruling. We have no reason after our review of the record, which the judge thoroughly canvassed, to conclude that the judge took defendant's silence into account when making his decision.

## IV.

"[F]ee determinations by trial courts will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion." Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001); Rendine v. Pantzer, 141 N.J. 292, 317 (1995). Defendant disputes the judge's award of counsel fees as

14

well as punitive damages. Defendant's attack, however, is premised on his argument that plaintiff was not believable and therefore did not meet her burden of proof. Having found plaintiff credible, the judge had ample basis for also finding that defendant assaulted her in the manner she described. We see nothing in the record that would cause us to set aside that finding. A trial court's credibility determination stands "unless 'clearly mistaken' or 'wide of the mark.'" E.P., 196 N.J. at 104. Plaintiff's credible narrative established a history of domestic violence and the final serious assault.

The Act authorizes the judge's award of counsel fees. N.J.S.A. 2C:25-29(b)(4). He reviewed counsel's submission and reduced the amount of fees requested based on defendant's objection that some charges included work counsel performed unrelated to the hearing. The award came only after the judge's detailed review of counsel's submission and a discussion of the relevant factors. See McGowan v. O'Rourke, 391 N.J. Super. 502, 507-08 (App. Div. 2007). The fee award should not be disturbed, as no abuse of the judge's discretion occurred. See Collier, 167 N.J. at 444.

The Act similarly allows for the award of punitive damages. N.J.S.A. 2C:25-29(b)(4). Such damages are appropriate where a court finds, as it did here, that the actor's conduct was motivated by "actual malice or accompanied

15

by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J.S.A. 2A:15-5.12(a). In light of the judge's conclusion that plaintiff's testimony was credible, and that defendant had a history of domestic violence culminating in plaintiff's crippling injury, the judge's findings with regard to punitive damages were also warranted.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1492-19